Bruce A. McDermott, OSB #116983
(Application for Admission to USDC Pending)
E-Mail: bmcdermott@gsblaw.com
Adam R. Kelly, OSB #023431
E-Mail: akelly@gsblaw.com
**Garvey Schubert Barer**
Eleventh Floor
121 SW Morrison Street
Portland, Oregon  97204
Telephone: 503 228 3939
Facsimile: 503 226 0259

      Attorneys for Plaintiff
      Federal Deposit Insurance Corporation,
      as Receiver for Columbia River Bank

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **FEDERAL DEPOSIT INSURANCE CORPORATION,** as Receiver for Columbia River Bank, | Case No. _____ |
| Plaintiff, | **COMPLAINT** |
| v. | (Gross Negligence; Breach of Fiduciary Duties; Negligence) |
| **ROGER CHRISTENSEN, BONNIE FLETCHER, HOWARD L. HARRIS, JAMES MCCALL, NANCY O'CONNOR, ANTHONY J. TARNASKY, BRITT W. THOMAS, CHARLES F. BEARDSLEY, WILLIAM A. BOOTH,** and **JAMES J. DORAN,** | **JURY TRIAL DEMANDED** |
| Defendants. | |

COMPLAINT
Page 1

Plaintiff Federal Deposit Insurance Corporation, as Receiver for Columbia River Bank ("FDIC-R"), for its Complaint against defendants Roger Christensen, Bonnie Fletcher, Howard L. Harris, James McCall, Nancy O'Connor, Anthony J. Tarnasky, Britt W. Thomas, Charles F. Beardsley, William A. Booth, and James J. Doran, alleges as follows:

## INTRODUCTION

1.      FDIC-R brings this action in its capacity as Receiver for Columbia River Bank ("CRB" or the "Bank") to recover over $39 million in losses the Bank suffered on fifteen commercial real estate ("CRE") and acquisition, development, and construction ("ADC") loans, one agricultural line of credit, and one agricultural term loan, approved from April 2006 through March 2008 (collectively, the "Transactions").

2.      FDIC-R asserts claims against three former directors and seven former officers[1] for gross negligence, negligence, and breach of fiduciary duties based on their approvals of the high-risk Transactions to uncreditworthy borrowers in violation of the Bank's loan policies, underwriting requirements, and prudent lending practices.

3.      Collectively, Defendants were charged with, among other responsibilities, operating and managing the lending function of a community bank.  Rather than manage the Bank's lending function in a sound and responsible manner, Defendants took unreasonable risks with the Bank's loan portfolio, allowed irresponsible and unsustainable rapid asset growth concentrated in high-risk and speculative ADC and CRE loans, disregarded regulator warnings regarding the Bank's lending practices and activities, violated the Bank's loan policies and procedures, and knowingly permitted poor underwriting of loans in contravention of the Bank's policies and prudent lending practices in the industry.

4.      Each of the Defendants also routinely and regularly recommended, encouraged,

---

[1] One of the former officers, Roger Christensen, was also a director of CRB.

assisted in approving, and/or affirmatively voted to approve loans and other extensions of credit without adequately informing themselves of the relevant risks in connection with the approval of loans, failed to prevent violations of CRB's loan policies, and failed to prevent the approval of loans they knew or should have known would likely cause the Bank to suffer substantial damages.

5.    Defendants' negligence, gross negligence, or breaches of fiduciary duties in their numerous and repeated violations of the Bank's loan policies and procedures, underwriting requirements, banking regulations, and prudent and sound banking practices are exemplified by the 17 Transactions, which caused damages to the bank of an amount to be proven at trial, but not less than $39,083,873.

6.    On January 22, 2010, the Oregon Division of Finance and Corporate Securities ("ODFCS") closed CRB and appointed the FDIC as Receiver.  The Bank failed with assets of $955.1 million and a loss to the FDIC's Deposit Insurance Fund currently estimated at $131.9 million.

## PARTIES

7.    The FDIC is a corporation organized and existing under the laws of the United States of America, specifically, 12 U.S.C. § 1811, *et seq.*, and is charged with, among other things, the orderly liquidation of failed financial institutions.  Pursuant to 12 U.S.C. § 1821(d)(2), the FDIC, as Receiver of CRB, has succeeded to all of the rights, titles, powers, and privileges of CRB, and of any stockholder, member, account holder, and/or depositor of CRB with respect to the Bank and its assets.  These rights include the exclusive right to pursue any claims or causes of action against the former directors and officers of CRB for negligence, gross negligence, and breaches of fiduciary duties, and any director and officer liability insurance policy.

8.    Roger Christensen was the Bank's Chief Executive Officer, President, and a member of the Bank's Board of Directors from 2003 until October 6, 2008.  Mr. Christensen was

also a member of the Board Loan Committee ("BLC"). Mr. Christensen did not participate in all of the BLC meetings. Mr. Christensen approved two of the Transactions as set forth herein. Mr. Christensen is a resident of North Salt Lake, Utah.

9.     Bonnie Fletcher was a Vice President of the Bank from February 2, 2004 to December 4, 2008. Ms. Fletcher was the originating loan officer that presented, recommended, and/or voted to approve seven of the Transactions as set forth herein. Ms. Fletcher is a resident of Beaverton, Oregon.

10.     Howard L. Harris was Vice President of Credit Approval and Special Credits for CRB from February 14, 2005 to January 8, 2009. Mr. Harris approved all 17 of the Transactions as set forth herein. Mr. Harris is a resident of Medford, Oregon

11.     James McCall was Executive Vice President and Chief Administrative Officer of CRB from September 2004 until CRB failed. Mr. McCall approved six of the Transactions as set forth herein. Mr. McCall is a resident of The Dalles, Oregon.

12.     Nancy O'Connor was a loan officer for CRB from February 28, 2003 until CRB failed. Ms. O'Connor was the originating loan officer that presented, recommended, and/or voted to approve seven of the Transactions as set forth herein. Ms. O'Connor is a resident of Bend, Oregon.

13.     Anthony J. Tarnasky was Senior Vice President of Credit Administration for CRB from December 29, 1997 to June 18, 2007. Mr. Tarnasky approved eleven of the Transactions as set forth herein. Mr. Tarnasky is a resident of Walla Walla, Washington.

14.     Britt W. Thomas was Executive Vice President and Chief Credit Officer for CRB from June 1, 1998 to October 29, 2007. Mr. Thomas approved eight of the Transactions as set forth herein. Mr. Thomas is a resident of The Dalles, Oregon.

15.     Charles F. Beardsley was a member of CRB's Board of Directors and the BLC from October 28, 1997 until October 21, 2009. Mr. Beardsley approved eight of the

Transactions as set forth herein. Mr. Beardsley is a resident of Hood River, Oregon.

16.     William A. Booth was a member of CRB's Board of Directors and the BLC from October 28, 1997 until October 21, 2009. Mr. Booth approved eight of the Transactions as set forth herein. Mr. Booth is a resident of The Dalles, Oregon.

17.     James J. Doran was a member of CRB's Board of Directors and the BLC from December 21, 1999 until October 21, 2009. Mr. Doran approved eight of the Transactions as set forth herein. Mr. Doran is a resident of Carlton, Oregon.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction over this action pursuant to 12 U.S.C. § 1819(b)(1) and (2), 12 U.S.C. § 1821(d) and (k), and 28 U.S.C. §§ 1331 and 1345.

19.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial portion of the events and/or omissions giving rise to the claims and damages asserted herein occurred in this district.

20.     This Court has personal jurisdiction over the Defendants who at all relevant times were residents of and/or conducted the business of the Bank in the State of Oregon.

## FACTS COMMON TO ALL CLAIMS

### A.     The Bank and Its Strategy for Aggressive Growth in ADC Lending.

21.     CRB was a state-chartered, nonmember bank established in 1977 and had its headquarters in The Dalles, Oregon. CRB was a wholly-owned subsidiary of Columbia Bancorp ("Bancorp"). CRB was a community bank established to serve an agricultural area of Oregon, with a focus on loans to farmers, homeowners, and local businesses.

22.     In 2003, CRB hired Roger Christensen as its President and CEO. Under Christensen's leadership, beginning in 2004, the Bank pursued an aggressive strategy designed for double digit growth annually.

23.     As part of its aggressive growth strategy, from 2004 to 2008, CRB expanded into

new geographic areas and shifted its focus to CRE lending, in particular ADC loans for residential projects in the Bend and Portland, Oregon areas, and in Vancouver, Washington. According to the Bank's February 16, 2006 loan policy, prior to April 2007, neither Portland, Oregon nor Vancouver, Washington was part of CRB's primary trade area.

24.     From 2004 through 2008, CRB grew by 60%, with total assets growing from $715 million in 2004 to $1.12 billion at the end of 2008. During this time period, CRB became heavily concentrated in ADC loans. In 2005, the Bank's ADC loans represented 225% of Total Capital; by June 2009, that figure grew to 381% of Total Capital. By comparison, in 2005, ADC loans for CRB's peer group banks represented just over 100% of total capital, and by the end of 2008 less than 150% of total capital. The Bank's CRE loans also rose to an excessive level of concentration, representing 843% of Total Capital in June 2009.

25.     CRE and ADC loans are known to be more speculative than other types of loans because of, among other reasons, the lack of present cash flow sources, uncertainties in development and sale, and the need for adequate secondary sources of repayment. Prudent lending in this segment of banking requires sound underwriting, timely evaluation and response to economic trends impacting the industry, and strict adherence to appropriate lending policies and standards, all of which the Defendants failed to do as part of their plan and design to rapidly grow the Bank's CRE and ADC loan portfolio.

26.     Despite the strategy for aggressive growth and management's appetite for risk, CRB failed to establish proper standards and risk management practices to mitigate and account for the corresponding risk. Defendants, in particular the members of the BLC, provided very little oversight in the loan approval process, and the BLC failed to take corrective measures when they were called for. When existing loan policies constrained lending practices, management, including the BLC, changed the policies to fit the practices that permitted the continued rapid loan growth. The Bank's business plan and strategy for aggressive growth in ADC lending, and

its lending practices and administration, encouraged and emphasized loan quantity rather than quality.

27.     Defendants permitted loans to be made in violation of Bank loan policies, including, but not limited to, exceeding policy limits in ADC loan concentration, exceeding loan-to-value ("LTV") ratios, failing to obtain up-to-date appraisals, lending to new borrowers with no experience in land development and construction, failing to analyze project feasibility, and disregarding insufficient borrower and guarantor net worth and liquidity limitations.

28.     During the period of tremendous growth and intense concentration in CRE and ADC loans, Defendants also failed to account for the declining residential real estate market that started in 2006 and failed to react appropriately to protect the Bank from significant loan losses.

29.     Defendants knew or should have known that the residential real estate market was declining beginning in 2006.  Despite this knowledge, Defendants continued to approve collateral-dependent ADC loans without adequate consideration of comments from in-house reviews of appraisals, without considering feasibility studies for the projects, and without critical examination of the illiquidity of the borrowers and guarantors.

30.     As CRB's loan portfolio grew, the concentration of CRE and ADC loans to total capital increased the risk to the Bank and, as the quality of the loans deteriorated, CRB's capital levels and earnings eroded.  CRB's concentrations in CRE and ADC lending made the Bank particularly vulnerable to a downturn in the real estate market.

31.     The deficient underwriting, risk management, and credit administration by Defendants in approving and encouraging the Transactions, combined with the Bank's rapid expansion into new geographical areas, excessive ADC loan concentrations, failure to establish appropriate practices to mitigate concentration risk, and failure to monitor the ADC loan portfolio, ultimately led to the Bank's failure in January 2010.

/ / /

B.   **CRB's Loan Policies and Loan Approval Authority**.

32.   Loan underwriting practices are the primary determinant of bank credit risk and bank credit availability and one of the most critical aspects of loan portfolio management. Loan underwriting standards define the bank's desired level of creditworthiness for individual loans and provide uniform criteria for evaluating loans. Loan underwriting practices and standards are also important in protecting the bank's capital, which can erode from unsafe and unsound lending practices.

33.   The foremost means to control loan quality and a good loan portfolio is by the loan approval process. An effective loan approval process establishes minimum requirements for the information and analysis upon which a credit decision is based. The purpose of a loan approval process is to provide controls to ensure acceptable credit at origination.

34.   CRB had specific written policies and procedures governing the underwriting, acquisition, and administration of loans (the "Loan Policy"). The Loan Policy was intended to ensure that the Bank pursued prudent banking practices, to provide a basis for sound credit decisions by the lending staff, and to limit the Bank's risk exposure. The Loan Policy was revised from time to time.

35.   Pursuant to the Loan Policy in effect in 2005, the President had a loan approval limit of $2 million, and the Chief Credit Officer ("CCO") had a limit of $4 million. By 2007, the CEO and CCO had loan approval limits of $10 million, and the President's limit increased to $5 million. The BLC was required to approve loans for aggregate debt to one borrower of over $10 million, and to approve additional debt over $2 million for loans rated 6, 7, or 8 under the Bank's risk rating procedures. The CCO was responsible for assigning lending and approval limits to the rest of the Bank's staff, up to the CCO's approval limit.

36.   As a result of the substantial approval and lending authority delegated to the Bank's officers, the BLC approved few loans.

COMPLAINT
Page 8

37.    The BLC was responsible for providing guidance and direction in the management of the loan portfolio, and primary board oversight of the loan portfolio and Loan Policy.  The CCO was responsible for administration of the lending policies.

38.    Pertinent provisions of the Loan Policy, in effect during the time period 2006 to 2008, include:

    a.    The Loan Policy prohibited lending to a borrower who was not creditworthy, and collateral value did not make a non-creditworthy borrower creditworthy.

    b.    Current, signed financial statements were required from all borrowers and guarantors, along with a loan write-up that included credit scores, the LTV ratio, debt service ratio, loan grade, history and character of the borrower, full borrower cash flow analysis, sensitivity analysis of business risks, and an identification of any policy exceptions.

    c.    Accountant-prepared income statements, cash flow statements, or tax returns were required for individual borrowers and guarantors.

    d.    Accountant-compiled financial statements were required for all CRE loans over $1 million.

    e.    ADC loans were only permitted to be made to "experienced successful developers."

    f.    Loans to developers that were new to the bank or out-of-area loans were only to be made with "additional due diligence and caution."

    g.    A complete appraisal prepared by a qualified appraiser in accordance with the Uniform Standards of Professional Appraisal Practice was required before a final credit decision could be made.  The useful life of an appraisal depended on the complexity of the property, the volatility of the market, and the length of time since that

last appraisal.

      h.      The Bank's Real Estate Risk Management Department was required to review all appraisals for loans for real estate projects in excess of $1 million.

      i.      Feasibility studies were required for all ADC loans exceeding $500,000.

      j.      Construction inspections with a completed construction report were required monthly. Third-party inspections were required on projects for loans in excess of $750,000.

      k.      Borrowers on ADC loans were required to provide a minimum of 10% cash equity.

      l.      The maximum LTV ratios were 50% for raw land loans and 70% for land development and commercial property loans.

      m.      The concentration limit for ADC loans as a percentage of tier 1 risk-based capital was 215% as of October 2006 (increased from 140%).

      n.      Concentrations of credit were to be closely monitored to ensure an acceptable diversification of risk and to help insulate the loan portfolio from adverse economic conditions.

39.      Defendants routinely disregarded the Bank's Loan Policy and failed to monitor and ensure compliance with Loan Policy provisions by approving loans to borrowers who were not creditworthy and/or for projects that provided insufficient collateral and guarantees for repayment, and by routinely exceeding the ADC loan concentration limits and failing to protect the loan portfolio from a decline in the real estate market.

**C.**      **Regulatory History of the Bank and Defendants' Lack of Response to Warnings**.

40.      Beginning in 2005, the Bank was repeatedly warned by state and federal bank examiners of the weaknesses in CRB's lending practices and of the need to establish effective monitoring and reporting procedures regarding the Bank's concentration of CRE and ADC loans

and construction loans, and its exposure related to such loans. Defendants ignored these warnings and recommendations, instead electing to raise the ADC concentration limits in the Loan Policy.

41.     In the Report of Examination ("RoE") as of March 31, 2005, bank examiners criticized the Bank's elevated commercial real estate concentration exposure, and criticized the fact that the Bank's risk management process was inadequate in relation to the economic conditions and CRE loan concentrations. The bank examiners recommended that the Bank develop policy guidance and reporting procedures to identify, measure, monitor, and control the Bank's concentration exposure, and develop a formal process to monitor economic conditions in the various markets CRB served.

42.     In the RoE as of March 31, 2007, examiners again criticized the fact that (despite recommendations made in the 2005 RoE) management had not developed an effective process for monitoring the bank's exposure to ADC loans, and needed to focus attention in establishing policies and procedures for monitoring ADC loans and documenting construction draws. The examiners also criticized the Bank's inconsistent implementation of its loan polices and procedures.

43.     In the RoE as of June 30, 2008, the FDIC rated CRB a composite CAMELS 4, stating that the Bank's condition was unsatisfactory.[2] Among other criticisms in the RoE, the examiners stated:

- "Management chose to engage in numerous high-risk activities that have created a

---

[2] Under the CAMELS rating system, each financial institution is assigned a composite rating based on an evaluation and rating of six essential components of an institution's financial condition and operations. These component factors address the adequacy of capital, the quality of assets, the capability of management, the quality and level of earnings, the adequacy of liquidity, and the sensitivity to market risk. Evaluations of the components take into consideration the institution's size and sophistication, the nature and complexity of its activities, and its risk profile. Composite and component ratings are assigned based on a 1 to 5 numerical scale. A 1 indicates the highest rating, strongest performance and risk management practices, and least degree of supervisory concern, while a 5 indicates the lowest rating, weakest performance, inadequate risk management practices and, therefore, the highest degree of supervisory concern.

severely unstable financial condition."

- "Internal and external warning signs that should have resulted in actions to reduce the bank's exposure to residential acquisition and development lending...were ignored."

- "Management positioned this institution for aggressive growth without appropriate standards for real estate concentrations and funding strategies."

44.     The RoE as of June 30, 2008, also noted several violations of Part 364 of the FDIC's Rules and Regulations, Standards for Safety and Soundness, including, failing to consider the observations, conclusions, and concerns conveyed in many ADC-related real estate appraisal reviews, and failing to recognize changing market conditions impacting the Bank's ADC concentration in a timely manner.

45.     From 2005 to first quarter 2008, Defendants ignored repeated warnings from regulators as they continued to make and encourage high risk loans and continued to tolerate poor underwriting, and the BLC and other directors failed to inquire about the loan policy exceptions and failed to insist that the officers follow the Bank's loan policies and the recommendations of the bank examiners.

46.     CRB consented to an Order to Cease and Desist effective February 3, 2009.  The Order required that the Bank cease and desist its unsafe and unsound banking practices by, among other things, ceasing to operate with inadequate capital in relation to the kind and quality of assets held by the Bank, ceasing to operate with a large volume of poor quality loans, and ceasing to operate in violation of Part 323 of the FDIC's Rules and Regulations (12 C.F.R. Part 323), which requires obtaining and maintaining current appraisals on collateral for real estate loans.  The Order also required that the Bank develop a plan to reduce the Bank's CRE loan concentration by systematically reducing the amount of CRE loans or other extensions of credit.

47.     The Bank failed to satisfy the requirements of the Order, and on December 23,

2009, the FDIC issued a Prompt Corrective Notice to CRB.  On January 22, 2010, the Oregon Division of Finance and Corporate Securities closed CRB.

**D.      The 17 Transactions**.

48.      In approving the 17 Transactions, Defendants, among other negligent and grossly negligent conduct, routinely failed to assess the ability of the borrowers and guarantors to repay loans, made collateral-dependent loans and loans with excessive LTV ratios, failed to adequately assess project risks, collateral values, and project feasibility, approved loans with inadequate cash flow for debt service, failed to consider or disregarded comments from the in-house reviews of appraisals, and relied on stale appraisals and financial information.

49.      The recommendation and approval of the Transactions were made by the Defendants pursuant to a common design and business plan that encouraged and emphasized aggressive and excessive ADC and CRE lending in new geographic markets, and loan quantity over quality.  The specific group of individual Defendants that together approved a particular Transaction acted in concert and aided and abetted one another in recommending and approving the Transaction despite knowing that the approval of the Transaction was based on improper and imprudent underwriting and lending practices as alleged herein.

50.      The specific group of individual Defendants that together approved a particular Transaction provided each other substantial assistance and encouragement in approving the Transaction knowing that the other's conduct was a breach of their duties to the Bank, and/or provided substantial assistance to each other in approving the Transaction while also separately breaching their own duties to the Bank.

51.      More than half of the Transactions were approved after the real estate market began its decline in late 2006.

52.      The losses to the Bank from the 17 Transactions total approximately $39.1 million.  The Transactions are summarized below.

COMPLAINT
Page 13

## RP Loan[3]

53.     On or about April 14, 2006, Harris and Tarnasky approved a $1.5 million unsecured line of credit to RP, a Portland real estate developer. Fletcher was the originating loan officer.

54.     The unsecured loan to RP was approved despite it being a disfavored loan under the Bank's Loan Policy, which provides, in pertinent part, that unsecured lending "is appropriate only when a borrower's character, capital, liquidity, historic operation performance, and management team indicate that such an extension of credit is proper."

55.     Defendants Harris, Tarnasky, and O'Connor were negligent, grossly negligent, and/or breached their fiduciary duties in approving this line of credit despite numerous loan underwriting deficiencies and/or policy violations, including, but not limited to, the following:

        a.     Failing to critically analyze the borrower's ability to repay the loan, a factor that is particularly important for supporting the approval of an unsecured loan.

        b.     The borrower's and guarantor's net worth were concentrated in real estate equities and real estate related entities.

        c.     The borrower had minimal liquidity.

56.     Multiple extensions of the loan's maturity date were approved without adequate analysis or underwriting to support the extensions, and without providing for additional security or sources for repayment of the loan.

57.     The Bank charged off the entire $1.5 million as a loss on this line of credit.

58.     Defendants Harris, Tarnasky, and O'Connor are jointly and severally liable for the Bank's loss on this loan because they acted together in pursuit of a common intent and as part of a common design or plan to aggressively grow the Bank's loan portfolio, provided each other substantial assistance or encouragement in approving this loan knowing that the other's conduct

_____

[3] The individual borrower's initials are used in order to protect the privacy of the individual.

was a breach of their duties to the Bank, and/or provided substantial assistance or encouragement to each other in approving this loan while also separately breaching their own duties to the Bank.

### Alterra Investments, LLC

59.     On or about May 10, 2006, Harris, Tarnasky, and Thomas approved a $3.64 million loan to Alterra Investments, LLC ("Alterra"), for the acquisition and development of a 36-lot subdivision on 6.35 acres of raw land in Bend, Oregon.  O'Connor was the originating loan officer.

60.     Defendants Harris, Tarnasky, Thomas, and O'Connor were negligent, grossly negligent, and/or breached their fiduciary duties in approving this loan despite numerous loan underwriting deficiencies and/or policy violations, including, but not limited to, the following:

        a.     This loan was approved for a borrower that had been in business for less than one year and was inexperienced in land development, a violation of the Bank's Loan Policy restricting ADC loans to "experienced successful developers."

        b.     This was a collateral-dependent loan as there was insufficient evidence to establish that the borrower and guarantor had the financial ability to repay or support the loan, and greater emphasis was placed on the value of the collateral and the pace of the market than on the financial strength and capability of the borrower.  By way of example only, the loan presentation and approval documents noted that Alterra had "modest liquidity."

        c.     On information and belief, the Bank failed to obtain appropriate financial statements from the borrower and guarantor as required by the Bank's Loan Policy, and relied on stale tax returns in its financial analysis.

        d.     In approving this loan, the Bank exceeded its policy limits for ADC loan concentrations, disregarding prior regulatory warnings regarding (a) over-concentration in ADC loans and (b) the Bank's poor monitoring and reporting procedures for loan

concentrations.

61.     Multiple extensions of the loan's maturity date were approved without adequate analysis or underwriting to support the extensions, and without providing for additional security or sources for repayment of the loan.

62.     The Bank charged off $1,296,907 as a loss on the Alterra loan.

63.     Defendants Harris, Tarnasky, Thomas, and O'Connor are jointly and severally liable for the Bank's loss on this loan because they acted together in pursuit of a common intent and as part of a common design or plan to aggressively grow the Bank's loan portfolio, provided each other substantial assistance or encouragement in approving this loan knowing that the other's conduct was a breach of their duties to the Bank, and/or provided substantial assistance or encouragement to each other in approving this loan while also separately breaching their own duties to the Bank.

### Redmond Communities, LLC

64.     On or about May 16, 2006, Harris, McCall, and Thomas approved an increase of an existing $584,000 acquisition loan to Redmond Communities, LLC, to $2.044 million for the development of a 33-lot single family residential subdivision in Redmond, Oregon. O'Connor was the originating loan officer.

65.     Defendants Harris, McCall, Thomas, and O'Connor were negligent, grossly negligent, and/or breached their fiduciary duties in approving this loan despite numerous loan underwriting deficiencies and/or policy violations, including, but not limited to, the following:

a.     This was a collateral-dependent loan as there was insufficient evidence that the borrower and guarantors had the financial ability to support and repay this loan. As specifically noted in the loan presentation and approval documents, several of the guarantors had low credit scores that were below the minimum required by the Bank's Loan Policy, the guarantors had very low liquidity, and their respective net worth were

centered in real estate equities.

b.      The loan presentation and approval documents note that the borrower represented that due to the cost of the land, there was minimal profit in the completed subdivision.  Thus, the loan was made based on the borrower's stated intentions of building out the subdivision and selling homes.  On information and belief, no feasibility study was performed for such development as required by the Bank's Loan Policy.

c.      The loan was approved despite the appraisal concluding that the subdivision project was not profitable for the borrower.

d.      On information and belief, no in-house review of the appraisal was performed or considered as required by the Bank's Loan Policy.

e.      In approving this loan, the Bank exceeded its policy limits for ADC loan concentrations, disregarding prior regulatory warnings regarding (a) over-concentration in ADC loans and (b) the Bank's poor monitoring and reporting procedures for loan concentrations.

66.      Multiple extensions of the loan's maturity date were approved without adequate analysis or underwriting to support the extensions, and without providing for additional security or sources for repayment of the loan.

67.      The Bank charged off $1,155,842 as a loss on the Redmond Communities loan.

68.      Defendants Harris, McCall, Thomas, and O'Connor are jointly and severally liable for the Bank's loss on this loan because they acted together in pursuit of a common intent and as part of a common design or plan to aggressively grow the Bank's loan portfolio, provided each other substantial assistance or encouragement in approving this loan knowing that the other's conduct was a breach of their duties to the Bank, and/or provided substantial assistance or encouragement to each other in approving this loan while also separately breaching their own duties to the Bank.

### Brookland Park, LLC

69.     On or about July 25, 2006, Christensen, Harris, Tarnasky, and Thomas approved a
$2.625 million loan to Brookland Park, LLC ("Brookland"), for the acquisition and development
of 22 lots for single family detached dwellings in Bend, Oregon.  O'Connor was the originating
loan officer.

70.     Defendants Christensen, Harris, Tarnasky, Thomas, and O'Connor were
negligent, grossly negligent, and/or breached their fiduciary duties by approving this loan despite
numerous loan underwriting deficiencies and/or policy violations, including, but not limited to,
the following:

        a.     The respective net worth of the four individual guarantors' was each
centered in real estate equities.

        b.     The borrower was a new entity with no financial history.

        c.     LV Funding, LLC, the sole member of Brookland and a guarantor on the
loan, had a negative net worth.

        d.     Defendants ignored the comments by the in-house review of the appraisal,
which noted that the real estate market was forecasted to slow in 2006, resulting in slower
projected absorption rates than predicted by the appraiser, and recommended a 5%
reduction in the LTV ratio to mitigate the risk associated with the speculative nature of
the appreciation factor applied by the appraiser.

        e.     This was a collateral-dependent loan, since there was insufficient evidence
that the borrower and guarantors had the financial ability to support and repay this loan.

        f.     On information and belief, no project feasibility study was prepared as
required by the Bank's Loan Policy.

        g.     In approving this loan, the Bank exceeded its policy limits for ADC loan
concentrations, disregarding prior regulatory warnings regarding (a) over-concentration

in ADC loans and (b) the Bank's poor monitoring and reporting procedures for loan concentrations.

71.     Multiple extensions of the loan's maturity date were approved without adequate analysis or underwriting to support the extensions, and without providing for additional security or sources for repayment of the loan.

72.     The Bank charged off $1,907,727 as a loss on this loan.

73.     Defendants Christensen, Harris, Tarnasky, Thomas, and O'Connor are jointly and severally liable for the Bank's loss on this loan because they acted together in pursuit of a common intent and as part of a common design or plan to aggressively grow the Bank's loan portfolio, provided each other substantial assistance or encouragement in approving this loan knowing that the other's conduct was a breach of their duties to the Bank, and/or provided substantial assistance or encouragement to each other in approving this loan while also separately breaching their own duties to the Bank.

### Renaissance Development Corp.

74.     On or about August 8, 2006, the BLC (Beardsley, Booth, and Doran) approved the renewal and extension of a $20 million internal guidance line ("IGL") to Renaissance Development Corp. for the acquisition and development of residential housing in Oregon and Washington. Harris, McCall, and Thomas also approved the IGL. Fletcher was the originating loan officer. $9 million of the IGL was participated to Zions Bank.

75.     In February 2007, a $4.62 million loan was approved for Renaissance under the IGL for the acquisition and development of the Hunter Ridge subdivision in Camas, Washington (Loan #89963). On information and belief, no separate loan presentation or approval memorandum was prepared to support Loan #89963, and the only loan presentation and approval materials with respect to this loan relate to the August 2006 approval of the IGL.

76.     Defendants Beardsley, Booth, Doran, Harris, McCall, Thomas, and Fletcher were

negligent, grossly negligent, and/or breached their fiduciary duties by approving the IGL and/or Loan #89963 despite numerous loan underwriting deficiencies and/or policy violations, including, but not limited to, the following:

      a.     On information and belief, no updated, accountant compiled financial statements or updated tax returns were obtained from the borrower or guarantor as required by the Bank's Loan Policy, and the analysis of the guarantor's finances was based on 2004 tax returns.

      b.     Despite cash flow and liquidity being identified as a secondary source of repayment, no cash flow analysis was performed.

      c.     The loan presentation and approval documents that were considered specifically noted that leverage is "an on going [sic] challenge for this entity" and that the borrower's leverage will exceed industry norm.

      d.     The 75% LTV ratio on Loan #89963 (permitted under the terms of the IGL) exceeded the 70% LTV ratio limit set by the Bank's Loan Policy.

77.     Loan covenants relating to the debt to net worth ratio and the current assets to liabilities ratio were waived or modified without adequate consideration in order to accommodate the borrower's financial performance and condition, and were modified to improper levels.

78.     Multiple extensions of the loan's maturity date were approved without adequate analysis or underwriting to support the extensions, and without providing for additional security or sources for repayment of the loan.

79.     The Bank charged off $1,885,000 as a loss on Loan #89963 to Renaissance.

80.     Defendants Beardsley, Booth, Doran, Harris, McCall, Thomas, and Fletcher are jointly and severally liable for the Bank's loss on Loan #89963 because they acted together in pursuit of a common intent and as part of a common design or plan to aggressively grow the

Bank's loan portfolio, provided each other substantial assistance or encouragement in approving the IGL and/or Loan #89963 knowing that the other's conduct was a breach of their duties to the Bank, and/or provided substantial assistance or encouragement to each other in approving the IGL and/or Loan #89963 while also separately breaching their own duties to the Bank.

### Tumac Mountain Development, LLC

81.     On or about August 14, 2006, Harris and Tarnasky approved a $2.58 million loan to Tumac Mountain Development, LLC, to develop a 33-lot residential subdivision in Redmond, Oregon.  O'Connor was the originating loan officer.

82.     Defendants Harris, Tarnasky, and O'Connor were negligent, grossly negligent, and/or breached their fiduciary duties in approving this loan despite numerous loan underwriting deficiencies and/or policy violations, including, but not limited to, the following:

        a.      On information and belief, accountant compiled financial statements were not obtained from the borrower as required by the Bank's Loan Policy.

        b.      On information and belief, no project feasibility study was prepared in violation of the Bank's Loan Policy.

        c.      The individual guarantor's net worth was centered in real estate equities and real estate related entities, and the majority of the guarantor's liquidity was tied up in another real estate project, resulting in minimal liquidity.  The loan presentation and approval documents also specifically noted that the guarantor's debt to income ratio exceeded guidelines.

        d.      The loan presentation and approval documents noted that the second guarantor, a corporation, had minimal equity and net income.

        e.      In approving this loan, the Bank exceeded its policy limits for ADC loan concentrations, disregarding prior regulatory warnings regarding (a) over-concentration in ADC loans and (b) the Bank's poor monitoring and reporting procedures for loan

concentrations.

83.    Multiple extensions of the loan's maturity date were approved without adequate
analysis or underwriting to support the extensions, and without providing for additional security
or sources for repayment of the loan.

84.    The Bank charged off $1,569,037 as a loss on the loan to Tumac Mountain.

85.    Defendants Harris, Tarnasky, and O'Connor are jointly and severally liable for
the Bank's loss on this loan because they acted together in pursuit of a common intent and as part
of a common design or plan to aggressively grow the Bank's loan portfolio, provided each other
substantial assistance or encouragement in approving this loan knowing that the other's conduct
was a breach of their duties to the Bank, and/or provided substantial assistance or encouragement
to each other in approving this loan while also separately breaching their own duties to the Bank.

### Columbia Crest Partners, LLC

86.    On or about August 28, 2006, Harris, McCall, and Tarnasky approved a $4.97
million loan to Columbia Crest Partners, LLC.  Fletcher was the originating loan officer.  The
loan refinanced an existing $6,000,000 acquisition and development loan from another lender on
a proposed 46-lot development in Washougal, Washington.

87.    Defendants Harris, McCall, Tarnasky, and Fletcher were negligent, grossly
negligent, and/or breached their fiduciary duties in approving this loan despite numerous loan
underwriting deficiencies and/or policy violations, including, but not limited to, the following:

   a.    The loan was made to a borrower that was inexperienced in land
   development in violation of the Bank's policy that limited ADC loans to "experienced
   successful developers."

   b.    The loan presentation and approval documents specifically noted that
   Columbia Crest was a young company with inconsistent cash flow and limited income.

   c.    The sole guarantor of the loan had "very limited liquidity" and a net worth

centered in real estate equities.

     d.     Despite the insufficient evidence regarding the financial abilities of the borrower and guarantor to support the loan, Harris recommended approval "[b]ased on the emphasis CRB is placing on this market…."

     e.     This was a collateral-dependent loan approved in a declining real estate market as there was insufficient evidence establishing the borrower's and guarantor's financial ability to support or repay the loan.

     f.     The loan was approved despite the analysis and comments from the in-house review of the appraisal noting that building permits in Clark County, Washington had dropped to below half of the 2005 permits in "a direct response to slowing sales," and that Clark County appeared to be in a slight over-supply situation. Based on these factors and the slowing in the real estate market, the in-house review of the appraisal projected an absorption period of over 15 months, which exceeded the one-year loan term and, as noted in the in-house review, created a slightly above average risk as related to absorption.

     g.     Contrary to the warnings from the in-house review of the appraisal, the loan presentation and approval documents specifically noted that the sole factor mitigating the borrower's inconsistent cash flow and inexperience was that given the location of the subdivision, absorption should exceed expectations.

     h.     On information and belief, no feasibility study was prepared as required by the Bank's Loan Policy.

     i.     In approving this loan, the Bank exceeded its policy limits for ADC loan concentrations, disregarding prior regulatory warnings regarding (a) over-concentration in ADC loans and (b) the Bank's poor monitoring and reporting procedures for loan concentrations.

88.    Multiple extensions of the loan's maturity date were approved without adequate analysis or underwriting to support the extensions, and without providing for additional security or sources for repayment of the loan.

89.    Defendants were also negligent, grossly negligent, and/or breached their fiduciary duties in approving a $140,000 line of credit to Columbia Crest to be used to pay the Bank the accrued interest on the loan.

90.    The Bank charged off $4,006,000 as a loss on the loan to Columbia Crest.

91.    Defendants Harris, McCall, Tarnasky, and Fletcher are jointly and severally liable for the Bank's loss on this loan because they acted together in pursuit of a common intent and as part of a common design or plan to aggressively grow the Bank's loan portfolio, provided each other substantial assistance or encouragement in approving this loan knowing that the other's conduct was a breach of their duties to the Bank, and/or provided substantial assistance or encouragement to each other in approving this loan while also separately breaching their own duties to the Bank.

### Awbrey Court Development Co., LLC

92.    On or about December 20, 2006, Christensen, Harris, and Tarnasky approved a $3.22 million loan to Awbrey Court Development Co., LLC ("Awbrey Court"), for the acquisition and development of 6.55 acres into 42 residential lots in Bend, Oregon. O'Connor was the originating loan officer.

93.    Defendants Christensen, Harris, Tarnasky, and O'Connor were negligent, grossly negligent, and/or breached their fiduciary duties in approving this loan despite numerous loan underwriting deficiencies and/or policy violations, including, but not limited to, the following:

    a.    This was a collateral-dependent loan as there was insufficient evidence to establish that the borrower and the guarantors had the financial ability to repay or support the loan. By way of example only, the loan presentation and approval documents note

that the "vast majority" of the guarantors' net worth was in real estate equities and real estate-related entities.[4]

b.    On information and belief, updated financial statements and/or tax returns of the borrower and guarantor were not obtained as required by the Bank's Loan Policy.

c.    The loan was approved based on a 10-month old appraisal issued to Bank of the Cascades.  By February 2008 (13 months after loan origination), the "as is" value was more than $300,000 lower than the value used at loan origination, and by June 2008, the as completed value was nearly $2.5 million lower than the as completed value assigned in the appraisal relied upon in approving this loan.  Had a timely appraisal been used, the LTV ratio likely would have exceeded the Bank's 70% LTV ratio limit set by the Bank's Loan Policy.

d.    On information and belief, no in-house review of the appraisal was performed or considered as required by the Bank's Loan Policy.

e.    In approving this loan, the Bank exceeded its policy limits for ADC loan concentrations, disregarding prior regulatory warnings regarding (a) over-concentration in ADC loans and (b) the Bank's poor monitoring and reporting procedures for loan concentrations.

94.    Multiple extensions of the loan's maturity date were approved without adequate analysis or underwriting to support the extensions, and without providing for additional security or sources for repayment of the loan.

95.    The Bank charged off $2,276,091 as a loss on the loan to Awbrey Court.

96.    Defendants Christensen, Harris, Tarnasky, and O'Connor are jointly and severally liable for the Bank's loss on this loan because they acted together in pursuit of a common intent and as part of a common design or plan to aggressively grow the Bank's loan portfolio, provided

---

[4] One of the guarantors was also a guarantor on the Brookland Park, LLC loan.

each other substantial assistance or encouragement in approving this loan knowing that the other's conduct was a breach of their duties to the Bank, and/or provided substantial assistance or encouragement to each other in approving this loan while also separately breaching their own duties to the Bank.

### Diamond Built Homes, LLC

97.     On or about November 30, 2006, Harris, Tarnasky, and Thomas approved a $4,421,500 loan to Diamond Built Homes, LLC ("Diamond"), for the acquisition and development of a 40-lot subdivision in Bend, Oregon.  The BLC (Beardsley, Booth, and Doran) approved the loan on or about December 28, 2006.

98.     Defendants Beardsley, Booth, Doran, Harris, Tarnasky, and Thomas were negligent, grossly negligent, and/or breached their fiduciary duties in approving this loan despite numerous loan underwriting deficiencies and/or policy violations, including, but not limited to, the following:

    a.     The guarantors had minimal liquidity and their respective net worth was each centered in real estate equities.

    b.     On information and belief, the loan was approved without obtaining financial statements or tax returns from the guarantors as required by the Bank's Loan Policy.

    c.     This was a collateral dependent loan as there was insufficient evidence to establish that the borrowers and guarantors had the financial ability to support the loan.

    d.     In approving this loan, the Bank exceeded its policy limits for ADC loan concentrations, disregarding prior regulatory warnings regarding (a) over-concentration in ADC loans and (b) the Bank's poor monitoring and reporting procedures for loan concentrations.

    e.     Defendants waived a loan covenant relating to the debt to net worth ratio

without adequate consideration.

99.     Multiple extensions of the loan's maturity date were approved without adequate analysis or underwriting to support the extensions, and without providing for additional security or sources for repayment of the loan.

100.    The Bank charged off $2,765,000 as a loss on the loan to Diamond.

101.    Defendants Beardsley, Booth, Doran, Harris, Tarnasky, and Thomas are jointly and severally liable for the Bank's loss on this loan because they acted together in pursuit of a common intent and as part of a common design or plan to aggressively grow the Bank's loan portfolio, provided each other substantial assistance or encouragement in approving this loan knowing that the other's conduct was a breach of their duties to the Bank, and/or provided substantial assistance or encouragement to each other in approving this loan while also separately breaching their own duties to the Bank.

## Anthem Equities, LLC

102.    On or about March 20, 2007, Harris, McCall, Tarnasky, and Thomas approved a $2.95 million loan to Anthem Equities, LLC ("Anthem"), for the acquisition and development of a single family subdivision in Bend, Oregon. O'Connor was the originating loan officer.

103.    Defendants Harris, McCall, Tarnasky, and O'Connor were negligent, grossly negligent, and/or breached their fiduciary duties in approving this loan despite numerous loan underwriting deficiencies and/or policy violations, including, but not limited to, the following:

     a.    The loan was approved based on the purported financial strength of the borrower; however, the assessment of the borrower's financial strength was based on internally prepared financial statements in violation of the Bank's Loan Policy, which required accountant compiled financial statements from the borrower. The Bank waived the requirement that audited financial statements be provided, merely requiring accountant prepared financials as of year-end 2007, nine months after the loan was

approved.

b.    On information and belief, no feasibility study was prepared as required by the Bank's Loan Policy.

c.    The loan's 75% LTV ratio exceeded the 70% LTV ratio limit set by the Bank's Loan Policy.

d.    The individual guarantors had significant contingent liabilities, and one of the guarantor's net worth was centered in real estate equities.

e.    The loan presentation and approval documents identified as a strength for this loan that Anthem was an established builder and developer in the Tigard, Oregon area, which is a completely different market from Bend, Oregon.

104.    The Bank charged off $1,764,750 as a loss on the loan to Anthem.

105.    Defendants Harris, McCall, Tarnasky, and O'Connor are jointly and severally liable for the Bank's loss on this loan because they acted together in pursuit of a common intent and as part of a common design or plan to aggressively grow the Bank's loan portfolio, provided each other substantial assistance or encouragement in approving this loan knowing that the other's conduct was a breach of their duties to the Bank, and/or provided substantial assistance or encouragement to each other in approving this loan while also separately breaching their own duties to the Bank.

### Wood Hill Homes, Inc. – Loan for Forest Meadows Subdivision

106.    On or about March 19, 2007, the BLC (Beardsley, Booth, and Doran) approved a $2,095,735 loan to Wood Hill Homes, Inc. ("Wood Hill"), for the acquisition and development of the Forest Meadows 15-lot residential subdivision in Bend, Oregon. Harris, Tarnasky, and Thomas also approved the loan. Fletcher was the originating loan officer. This loan was made under a $10 million internal guidance line approved for Wood Hill.

107.    Defendants Beardsley, Booth, Doran, Harris, Tarnasky, Thomas, and Fletcher

were negligent, grossly negligent, and/or breached their fiduciary duties in approving this loan despite numerous loan underwriting deficiencies and/or policy violations, including, but not limited to, the following:

        a.      On information and belief, no in-house review of the appraisal for this loan was performed or considered as required by the Bank's Loan Policy.

        b.      On information and belief, no loan presentation or approval memorandum was prepared to support this individual loan.  The only loan presentation materials relate to the renewal of a $10 million in-house guidance line for Wood Hill.

        c.      The loan presentation and approval documents that were prepared specifically noted that "there has been an overall slowdown in the residential real estate market," but that this supposedly was mitigated by the fact that Wood Hill is building homes for the entry-level and "move-up" buyer.

        d.      The guarantors' net worth was centered in real estate and real estate related entities.

        e.      In approving this loan, the Bank exceeded its policy limits for ADC loan concentrations, disregarding prior regulatory warnings regarding (a) over-concentration in ADC loans and (b) the Bank's poor monitoring and reporting procedures for loan concentrations.

108.    The Bank charged off $1,457,000 as a loss on the loan to Wood Hill for the Forest Meadows subdivision.

109.    Defendants Beardsley, Booth, Doran, Harris, Tarnasky, Thomas, and Fletcher are jointly and severally liable for the Bank's loss on this loan because they acted together in pursuit of a common intent and as part of a common design or plan to aggressively grow the Bank's loan portfolio, provided each other substantial assistance or encouragement in approving this loan knowing that the other's conduct was a breach of their duties to the Bank, and/or provided

substantial assistance or encouragement to each other in approving this loan while also separately breaching their own duties to the Bank.

## Zephyr Communities, LLC

110.    In March, 2006, Harris and Tarnasky approved a $3,045,000 acquisition and development loan to Zephyr Communities, LLC ("Zephyr"), for the 30-lot "Vintage View" subdivision in Camas, Washington.  Fletcher was the originating loan officer.

111.    Defendants Harris, Tarnasky, and Fletcher were negligent, grossly negligent, and/or breached their fiduciary duties by approving this loan despite numerous loan underwriting deficiencies and/or policy violations, including, but not limited to, the following:

    a.    There was insufficient evidence establishing that the borrower and guarantors had the financial ability to support the loan.  For example, Harris's loan recommendation memorandum specifically noted that "the guarantor offers virtually no financial support to our request."

    b.    The loan was made to a borrower that was inexperienced in land development in violation of the Bank's policy that limited ADC loans to "experienced successful developers."

    c.    On information and belief, no feasibility study was prepared as required by the Bank's Loan Policy.

    d.    In approving this loan, the Bank exceeded its policy limits for ADC loan concentrations, disregarding prior regulatory warnings regarding (a) over-concentration in ADC loans and (b) the Bank's poor monitoring and reporting procedures for loan concentrations.

112.    In 2007, Zephyr experienced substantial financial problems.  As a result, the Bank decided to restructure the loan by making a new loan to the original seller of the subdivision and investors who were going to assume management control of the development.

113.    On or about March 30, 2007, the BLC (Beardsley, Booth, and Doran) approved an application to rewrite the 2006 loan to Zephyr by lending $6 million to the new developers' entity, Vintage View Community, LLC ("Vintage View"), to be used to pay off the existing loan to Zephyr and to complete construction on the 30-lot Vintage View subdivision.  Harris and Tarnasky also approved the loan to Vintage View.  Fletcher was the originating loan officer.

114.    Contrary to the intended purpose of the Vintage View loan, the Zephyr loan was not paid down in full.  In addition, on information and belief, neither Vintage View nor the guarantors of the Vintage View loan assumed or guaranteed the loan to Zephyr.

115.    The Bank charged off $1,289,110 as a loss on the loan to Zephyr.

116.    Defendants Beardsley, Booth, Doran, Harris, Tarnasky, and Fletcher are jointly and severally liable for the Bank's loss on the loan to Zephyr because they acted together in pursuit of a common intent and as part of a common design or plan to aggressively grow the Bank's loan portfolio, provided each other substantial assistance or encouragement in approving this loan knowing that the other's conduct was a breach of their duties to the Bank, and/or provided substantial assistance or encouragement to each other in approving this loan while also separately breaching their own duties to the Bank.

## TWH Alpine View, 44 LLC

117.    On or about April 5, 2007, the BLC (Beardsley, Booth, and Doran) approved a $6,682,000 loan to TWH Alpine View, 44 LLC ("TWH"), for the acquisition of 44 completed lots in Tigard, Oregon, and construction of residential dwellings on the lots.  Harris also approved this loan.  Fletcher was the originating loan officer.

118.    Defendants Beardsley, Booth, Doran, Harris, and Fletcher were negligent, grossly negligent, and/or breached their fiduciary duties in approving this loan despite numerous loan underwriting deficiencies and/or policy violations, including, but not limited to, the following:

a.    This was a collateral dependent loan, since there was insufficient evidence

to establish the borrower's or guarantor's financial ability to support or repay the loan.

        b.      On information and belief, no feasibility study was prepared as required by the Bank's Loan Policy.

        c.      The loan's 75% LTV ratio exceeded the limit set by the Bank's Loan Policy.

        d.      The assessment of the borrower's financial strength was based on internally prepared financial statements in violation of the Bank's Loan Policy, which required accountant compiled financial statements from the borrower.

119.    The Bank charged off $2,214,500 as a loss on the loan to TWH.

120.    Defendants Beardsley, Booth, Doran, Harris, and Fletcher are jointly and severally liable for the Bank's loss on this loan because they acted together in pursuit of a common intent and as part of a common design or plan to aggressively grow the Bank's loan portfolio, provided each other substantial assistance or encouragement in approving this loan knowing that the other's conduct was a breach of their duties to the Bank, and/or provided substantial assistance or encouragement to each other in approving this loan while also separately breaching their own duties to the Bank.

### Vista Northwest, Inc.

121.    The Bank's relationship with Vista Northwest, Inc. began in June 2006, when the Bank approved a $2.2 million acquisition and development loan for a 19-lot subdivision in Beaverton, Oregon. The 2006 loan was never funded because Vista was unaware of the maximum density allowance on the property set by the City of Beaverton, resulting in major delay in the commencement of the project while Vista obtained approval from the city for the project and resolved related legal issues.

122.    Once Vista obtained the proper approvals for the project, on or about April 26, 2007, Harris approved the "refreshed" loan to Vista and increased loan amount to $2.8 million.

Fletcher was the originating loan officer.  Ultimately, $2,261,000 of the $2.8 million loan was disbursed to Vista.

123.    Defendants Harris and Fletcher were negligent, grossly negligent, and/or breached their fiduciary duties in approving this loan despite numerous loan underwriting deficiencies and/or policy violations, including, but not limited to, the following:

a.    This was a collateral dependent loan, since there was insufficient evidence to establish the borrower's or guarantor's financial ability to support or repay the loan.

b.    On information and belief, no feasibility study was prepared as required by the Bank's Loan Policy.

c.    The guarantor's net worth was centered in real estate and long-term assets, and he had minimal liquidity.  The loan presentation and approval documents specifically identified as a weakness the fact that the guarantor "provides only a moderate secondary source of repayment."

d.    The borrower had minimal liquidity, constricted cash flow, and reported a net loss in 2006.  The loan presentation and approval documents specifically noted that the borrower's leverage increased significantly in 2005 and 2006.

e.    On information and belief, accountant compiled financial statements were not obtained from the borrower as required by the Bank's Loan Policy.

f.    The loan was approved based on a one-year old appraisal obtained in 2006 for the loan that was never funded.  On information and belief, no updated appraisal was obtained for the 2007 loan despite the fact that Defendants knew, or should have known, that the real estate market was declining.

g.    The loan was made to a borrower that had no prior experience with a development project as large as this one.

h.    The loan presentation and approval documents identified as a weakness

the fact that Vista is building in a price range that "is experiencing increased marketing times compared to the real estate boom years of 2005 and early 2006."

124. The Bank charged off $1,018,870 as a loss on the loan to Vista.

125. Defendants Harris and Fletcher are jointly and severally liable for the Bank's loss on this loan because they acted together in pursuit of a common intent and as part of a common design or plan to aggressively grow the Bank's loan portfolio, provided each other substantial assistance or encouragement in approving this loan knowing that the other's conduct was a breach of their duties to the Bank, and/or provided substantial assistance or encouragement to each other in approving this loan while also separately breaching their own duties to the Bank.

### Wood Hill Homes, Inc. – Loan for Reed Pointe Subdivision

126. On or about December 30, 2007, the BLC (Beardsley, Booth, and Doran) approved a $3.525 million loan to Wood Hill Homes, Inc., to refinance a loan for the 47-lot residential Reed Pointe subdivision in Bend, Oregon. Harris, Tarnasky, and Thomas also approved the loan. Fletcher was the originating loan officer. This loan was made under a $10 million internal guidance line approved for Wood Hill.

127. Defendants Beardsley, Booth, Doran, Harris, Tarnasky, Thomas, and Fletcher were negligent, grossly negligent, and/or breached their fiduciary duties in approving this loan despite numerous loan underwriting deficiencies and/or policy violations, including, but not limited to, the following:

a. On information and belief, no loan presentation or approval memorandum was prepared and considered to support this individual loan. The only loan presentation and approval documents related to the renewal of a $10 million in-house guidance line for Wood Hill.

b. The loan was approved based on an appraisal for Phase 1 of the Reed Pointe subdivision project dated October 2006, more than one year before this loan was

approved. On information and belief, the Bank failed to obtain an updated appraisal despite the fact that Defendants knew, or should have known, that the real estate market had softened considerably since then.

        c.     The December 2007 review of the appraisal indicated that the appraised value for Phase 2 of the Reed Pointe subdivision was overstated and should be adjusted down by $480,000. On information and belief, no review of the appraisal was presented to or considered by the BLC.

    128.    The Bank charged off $1,698,039 as a loss on the loan to Wood Hill for the Reed Pointe subdivision.

    129.    Defendants Beardsley, Booth, Doran, Harris, Tarnasky, Thomas, and Fletcher are jointly and severally liable for the Bank's loss on this loan because they acted together in pursuit of a common intent and as part of a common design or plan to aggressively grow the Bank's loan portfolio, provided each other substantial assistance or encouragement in approving this loan knowing that the other's conduct was a breach of their duties to the Bank, and/or provided substantial assistance or encouragement to each other in approving this loan while also separately breaching their own duties to the Bank.

## GC Loan[5]

    130.    On or about March 28, 2008, the BLC (Beardsley, Booth, and Doran) approved two loans in the amount of $6.5 million and $5,524,406 to GC. The loans were approved to restructure an existing $10.5 million line of credit and $524,406.37 equipment loan for GC's hay farm business in order to improve the repayment program on those loans because the borrower was unable to satisfy the original repayment terms. Harris and McCall also approved the two 2008 loans to GC.

    131.    The $6.5 million loan included $5.5 million of the original $10.5 million line of

---

[5] The individual borrower's initials are used in order to protect the privacy of the individual.

credit, and an additional $1 million of new money to provide additional operating funds to the borrower. The loan presentation and approval documents state that the purpose and strategy for approving the $1 million in new funds was to provide a fully monitored line of credit to show another lender that the borrower and his hay operation were capable of performing under a line of credit. The loan presentation and approval documents noted that once the borrower operated under the monitored line of credit, another lender should refinance the line of credit and pay off CRB.

133.    The second 2008 loan to GC in the amount of $5,524,406.37 was structured to cover the "non-revolving" portion ($5 million) of the existing $10.5 million line of credit, and was also combined with the remaining balance of the equipment loan. The loan was placed on a 20-year amortization schedule, with quarterly interest payments.

133.    Defendants Beardsley, Booth, Doran, Harris, and McCall were negligent, grossly negligent, and/or breached their fiduciary duties in approving these loans despite numerous loan underwriting deficiencies and/or policy violations, including, but not limited to, the following:

a.    The loans were approved despite insufficient evidence of the borrower's or guarantors' financial ability to support or repay the loans. The Bank began "workout" discussions on the original loans to GC in 2005 because of his inability to repay the loans as originally structured. Despite GC's inability to pay or support the loan, the Bank extended the maturity dates in 2007, and ultimately restructured the loan with $1 million in additional funds

b.    On information and belief, Defendants relied on borrower-prepared financial statements for the loans in violation of the Bank's Loan Policy, which requires accountant-compiled financial statements and/or tax returns for individual borrowers.

c.    Multiple extensions of the maturity date were approved without adequate analysis or underwriting to support the extensions, and without providing for additional

security or sources for repayment of the loan.

        d.     Additional funds were advanced to the borrower when he was already in default.

134.    Defendants also failed to properly monitor and administer the loans with the borrower, allowing millions of dollars in loan funds to be diverted to other entities in which GC had an interest, primarily for the development of a golf course.

135.    The Bank charged off $6.5 million as a loss on the first loan, and $4.78 million as a loss on the second loan. The total losses on these loans is more than the amount that was due on the original line of credit and equipment loan before the 2008 refinance and extension of additional funds.

136.    Defendants Beardsley, Booth, Doran, Harris, and McCall are jointly and severally liable for the Bank's loss on this loan because they acted together in pursuit of a common intent, provided each other substantial assistance or encouragement in approving this loan knowing that the other's conduct was a breach of their duties to the Bank, and/or provided substantial assistance or encouragement to each other in approving this loan while also separately breaching their own duties to the Bank.

## FIRST CLAIM FOR RELIEF

### (Gross Negligence/Violation of 12 U.S.C. § 1821(k))

137.    FDIC-R realleges and incorporates by reference paragraphs 1 through 136 above.

138.    Pursuant to the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA"), 12 U.S.C. § 1821(k), Defendants were required to refrain from engaging in grossly negligent or reckless conduct in all matters relating to and affecting the operations and business of CRB.

139.    Pursuant to 12 U.S.C. § 1821(k), a director or officer of an insured depository institution may be personally liable for monetary damages in a civil action brought by the FDIC

as receiver for gross negligence or reckless conduct, as defined by Oregon law.

140.    Defendants owed CRB and its shareholders duties to use reasonable care, skill, and diligence in the performance of their duties, including, but not limited to, (a) conducting proper due diligence on proposed loans and the risks such loans posed to the Bank before approving them, (b) complying with the Bank's Loan Policy, (c) ensuring that any loans approved were underwritten in a manner consistent with prudent lending practices, (d) ensuring that any loans approved were secured by sufficiently valuable collateral and guarantees in order to prevent or minimize the risk of loss to the Bank, (e) ensuring that any loans approved did not violate applicable banking laws and regulations, and (f) ensuring that any loans approved did not create unsafe and unsound concentrations of credit.

141.    Defendants breached their duties and were grossly negligent and/or reckless in managing and operating CRB as alleged herein, and by, among other things, (a) failing to conduct proper due diligence on the Transactions and the risks the Transactions posed to the Bank before approving them, (b) disregarding the Bank's Loan Policy and approving the Transactions on terms that violated the Bank's Loan Policy, (c) failing to implement and enforce adequate underwriting practices, (d) failing to ensure that the Transactions were secured by sufficiently valuable collateral and guarantees in order to prevent or minimize the risk of loss to the Bank, (e) ignoring or disregarding declining market conditions and the effect on CRB's concentration in ADC loans and the residential housing market, (f) accelerating loan growth in a failing market, (g) failing to ensure that the Transactions did not create unsafe and unsound concentrations of credit, in particular ADC loans, (h) disregarding or ignoring warnings and recommendations from bank examiners and regulators about the Bank's lending operations and loan portfolio, and (i) violating federal regulations and state and federal regulatory instructions.

142.    Defendants knew or should have known of the risks associated with approving the Transactions and the Bank's deficient lending practices, yet approved the Transactions despite

this knowledge.

143.    As a direct and proximate result of Defendants' gross negligence and/or reckless conduct, CRB suffered damages in an amount to be proven at trial, but not less than $39,083,873, plus prejudgment interest as allowed by 12 U.S.C. § 1821(l) and Oregon law.

## SECOND CLAIM FOR RELIEF

### (Breach of Fiduciary Duties)

144.    FDIC-R realleges and incorporates by reference paragraphs 1 through 136 above.

145.    Defendants owed CRB and its shareholders the fiduciary duties of care, loyalty, and good faith and fair dealing in all matters relating to the management, operation, and business of CRB, including safeguarding the solvency of the Bank and protecting its assets.

146.    Defendants owed CRB and its shareholders a duty to use reasonable care, skill, and diligence in the performance of their duties, including, but not limited to, (a) conducting proper due diligence on proposed loans and the risks such loans posed to the Bank before approving them, (b) complying with the Bank's Loan Policy, (c) ensuring that any loans approved were underwritten in a manner consistent with prudent lending practices, (d) ensuring that any loans approved were secured by sufficiently valuable collateral and guarantees in order to prevent or minimize the risk of loss to the Bank, (e) ensuring that any loans approved did not violate applicable banking laws and regulations, and (f) ensuring that any loans approved did not create unsafe and unsound concentrations of credit.

147.    Defendants breached their fiduciary duties as alleged herein, and by, among other things, (a) failing to conduct proper due diligence on the Transactions and the risks the Transactions posed to the Bank before approving them, (b) disregarding the Bank's Loan Policy and approving the Transactions on terms that violated the Bank's Loan Policy, (c) failing to implement and enforce adequate underwriting practices, (d) failing to ensure that the Transactions were secured by sufficiently valuable collateral and guarantees in order to prevent

or minimize the risk of loss to the Bank, (e) ignoring or disregarding declining market conditions and the effect on CRB's concentration in ADC loans and the residential housing market, (f) accelerating loan growth in a failing market, (g) failing to ensure that the Transactions did not create unsafe and unsound concentrations of credit, in particular ADC loans, (h) disregarding or ignoring warnings and recommendations from bank examiners and regulators about the Bank's lending operations and loan portfolio, and (i) violating federal regulations and state and federal regulatory instructions.

148.    Defendants knew or should have known of the risks associated with approving the Transactions and the Bank's deficient lending practices, yet approved the Transactions despite this knowledge.

149.    As a direct and proximate result of Defendants' breach of fiduciary duties, CRB suffered damages in an amount to be proven at trial, but not less than $39,083,873, plus prejudgment interest as allowed by 12 U.S.C. § 1821(l) and Oregon law.

## THIRD CLAIM FOR RELIEF

### (Negligence)

150.    FDIC-R realleges and incorporates herein by reference paragraphs 1 through 136 above.

151.    As officers of CRB, Defendants Christensen, Fletcher, Harris, McCall, O'Connor, Tarnasky, and Thomas owed CRB and its shareholders duties to use reasonable care, skill, and diligence in the performance of their duties, including, but not limited to, (a) conducting proper due diligence on proposed loans and the risks such loans posed to the Bank before approving them, (b) complying with the Bank's Loan Policy, (c) ensuring that any loans approved were underwritten in a manner consistent with prudent lending practices, (d) ensuring that any loans approved were secured by sufficiently valuable collateral and guarantees in order to prevent or minimize the risk of loss to the Bank, (e) ensuring that any loans approved did not violate

applicable banking laws and regulations, and (f) ensuring that any loans approved did not create unsafe and unsound concentrations of credit.

152.    Defendants Christensen, Fletcher, Harris, McCall, O'Connor, Tarnasky, and Thomas breached their duties in managing and operating CRB as alleged herein, and by, among other things, (a) failing to conduct proper due diligence on the Transactions and the risks the Transactions posed to the Bank before approving them, (b) disregarding the Bank's Loan Policy and approving the Transactions on terms that violated the Bank's Loan Policy, (c) failing to implement and enforce adequate underwriting practices, (d) failing to ensure that the Transactions were secured by sufficiently valuable collateral and guarantees in order to prevent or minimize the risk of loss to the Bank, (e) ignoring or disregarding declining market conditions and the effect on CRB's concentration in ADC loans and the residential housing market, (f) accelerating loan growth in a failing market, (g) failing to ensure that the Transactions did not create unsafe and unsound concentrations of credit, in particular ADC loans, (h) disregarding or ignoring warnings and recommendations from bank examiners and regulators about the Bank's lending operations and loan portfolio, and (i) violating federal regulations and state and federal regulatory instructions.

153.    Defendants Christensen, Fletcher, Harris, McCall, O'Connor, Tarnasky, and Thomas knew or should have known of the risks associated with approving the Transactions and the Bank's deficient lending practices, yet approved the Transactions despite this knowledge.

154.    As a direct and proximate result of Defendants Christensen's, Fletcher's, Harris's, McCall's, O'Connor's, Tarnasky's, and Thomas's breach of their duties, CRB suffered damages in an amount to be proven at trial, but not less than $39,083,873, plus prejudgment interest as allowed by 12 U.S.C. § 1821(l) and Oregon law.

/ / /

/ / /

## **PRAYER FOR RELIEF**

WHEREFORE, FDIC-R prays for relief as follows:

A.    On FDIC-R's First, Second, and Third Claims for Relief, judgment against Defendants as follows:

1.    Judgment against Defendants Harris, Tarnasky, and O'Connor for joint and several liability in an amount to be proven at trial, but not less than $1,500,000, together with prejudgment interest as allowed by law, for the losses incurred on the April 14, 2006 loan to RP;

2.    Judgment against Defendants Harris, Tarnasky, Thomas, and O'Connor for joint and several liability in an amount to be proven at trial, but not less than $1,296,907, together with prejudgment interest as allowed by law, for the losses incurred on the May 10, 2006 loan to Alterra Investments, LLC;

3.    Judgment against Defendants Harris, McCall, Thomas, and O'Connor for joint and several liability in an amount to be proven at trial, but not less than $1,155,842, together with prejudgment interest as allowed by law, for the losses incurred on the May 18, 2006 loan to Redmond Communities, LLC;

4.    Judgment against Defendants Christensen, Harris, Tarnasky, Thomas, and O'Connor for joint and several liability in an amount to be proven at trial, but not less than $1,907,727, together with prejudgment interest as allowed by law, for the losses incurred on the July 25, 2006 loan to Brookland Park, LLC;

5.    Judgment against Defendants Beardsley, Booth, Doran, Harris, McCall, Thomas, and Fletcher for joint and several liability in an amount to be proven at trial, but not less than $1,885,000, together with prejudgment interest as allowed by law, for the losses incurred on Loan #89963 to Renaissance Development Corp.;

6.    Judgment against Defendants Harris, Tarnasky, and O'Connor for joint

and several liability in an amount to be proven at trial, but not less than $1,569,037, together with prejudgment interest as allowed by law, for the losses incurred on the August 14, 2006 loan to Tumac Mountain Development, LLC;

7.      Judgment against Defendants Harris, McCall, Tarnasky, and Fletcher for joint and several liability in an amount to be proven at trial, but not less than $4,006,000, together with prejudgment interest as allowed by law, for the losses incurred on the August 28, 2006 loan to Columbia Crest Partners, LLC;

8.      Judgment against Defendants Christensen, Harris, Tarnasky, and O'Connor, jointly and severally, for an amount to be proven at trial, but not less than $2,276,091, together with prejudgment interest as allowed by law, for the losses incurred on the December 20, 2006 loan to Awbrey Court Development Co., LLC;

9.      Judgment against Defendants Beardsley, Booth, Doran, Harris, Tarnasky, and Thomas for joint and several liability in an amount to be proven at trial, but not less than $2,765,000, together with prejudgment interest as allowed by law, for the losses incurred on the November 30, 2006 loan to Diamond Built Homes, LLC;

10.     Judgment against Defendants Harris, McCall, Tarnasky, Thomas, and O'Connor for joint and several liability in an amount to be proven at trial, but not less than $1,764,750, together with prejudgment interest as allowed by law, for the losses incurred on the March 20, 2007 loan to Anthem Equities, LLC;

11.     Judgment against Defendants Beardsley, Booth, Doran, Harris, Tarnasky, Thomas, and Fletcher for joint and several liability in an amount to be proven at trial, but not less than $1,457,000, together with prejudgment interest as allowed by law, for the losses incurred on the March 30, 2007 loan to Wood Hill Homes, Inc;

12.     Judgment against Beardsley, Booth, Doran, Harris, Tarnasky, and Fletcher for joint and several liability in an amount to be proven at trial, but not less than

$1,289,110, together with prejudgment interest as allowed by law, for the losses incurred on the March 2006 loan to Zephyr Communities, LLC;

13.    Judgment against Beardsley, Booth, Doran, Harris, and Fletcher for joint and several liability in an amount to be proven at trial, but not less than $2,214,500, together with prejudgment interest as allowed by law, for the losses incurred on the April 5, 2007 loan to TWH Alpine View, 44 LLC;

14.    Judgment against Harris and Fletcher for joint and several liability in an amount to be proven at trial, but not less than $1,018,870, together with prejudgment interest as allowed by law, for the losses incurred on the April 26, 2007 loan to Vista Northwest, Inc.;

15.    Judgment against Beardsley, Booth, Doran, Harris, Tarnasky, Thomas, and Fletcher for joint and several liability in an amount to be proven at trial, but not less than $1,698,039, together with prejudgment interest as allowed by law, for the losses incurred on the December 30, 2007 loan to Wood Hill Homes, Inc.;

16.    Judgment against Beardsley, Booth, Doran, Harris, and McCall for joint and several liability in an amount to be proven at trial, but not less than $11,280,000, together with prejudgment interest as allowed by law, for the losses incurred on the two March 28, 2008 loans to GC.

B.    For FDIC-R's costs and disbursements incurred herein;

C.    For post-judgment interest against all Defendants at the prevailing legal rate; and

D.    For such other relief as the Court may deed just and proper.

/ / /

/ / /

/ / /

/ / /

## DEMAND FOR JURY TRIAL

FDIC-R demands a jury trial.

DATED:  January 18, 2013.

GARVEY SCHUBERT BARER


By   s/ Adam R. Kelly
      Bruce A. McDermott, OSB #116983
      (*Application for Admission to USDC*
      *Pending*)
      E-Mail:  bmcdermott@gsblaw.com
      Adam R. Kelly, OSB #023431
      E-Mail:  akelly@gsblaw.com
      Telephone:  503 228 3939
      Fax:  503 226 0259

      Attorneys for Plaintiff
      Federal Deposit Insurance Corporation, as
      Receiver for Columbia River Bank

PDX_DOCS:495768.2

COMPLAINT
Page 45